UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


AUDREY WESSMAN,                         )
                                        )
                      Plaintiff,        )
                                        )
          v.                            )          12 C 6712
                                        )
DDB CHICAGO INC.,                       )
                                        )
                      Defendant.        )

## **MEMORANDUM OPINION**

CHARLES P. KOCORAS, District Judge:

This matter comes before the Court on the motion for summary judgment by

Defendant DDB Chicago, Inc. ("DDB Chicago") pursuant to Federal Rule of Civil

Procedure 56. For the reasons set forth below, the motion is denied.

## BACKGROUND

I.     Facts

The following facts are derived from the parties' respective statements and

exhibits filed pursuant to Northern District of Illinois Local Rule 56.1. The Court

reviews each Local Rule 56.1 statement and disregards any argument, conclusion, or

assertion unsupported by the evidence in the record. DDB Chicago is an advertising

agency and a subsidiary of DDB Worldwide, Inc. ("DDB Worldwide"). Plaintiff

Audrey Wessman ("Wessman") was employed intermittently with DDB Chicago between 1997 and 2011.

On February 14, 2011, Wessman returned to DDB Chicago as an independent contractor to work on the Wrigley account. She completed a brief stint of approximately two months on this assignment, and DDB Chicago offered Wessman the position of Account Director on the Safeway account, effective March 21, 2011. Wessman accepted the position with a salary of $100,000. Previously, she had been earning approximately $12,000 per month as an independent contractor.

Safeway is the second largest grocery chain in the United States. The Safeway account differed from the Wrigley account in that Safeway was based on the West Coast whereas Wrigley was locally based. Thus, working on the Safeway account required travel to the West Coast. Also, the two-hour time zone difference caused difficulties for Wessman with respect to participating in phone conferences with Safeway's West Coast representatives. Wessman made these concerns known prior to accepting DDB's offer, citing her need to pick up and otherwise care for her children. Wessman claims that she accepted the job on the condition that she would undertake an eighty percent work load, an assertion which DDB Chicago disputes.

Wessman began working on the Safeway account. The working environment was not harmonious; there existed two "camps" of team members. The first consisted of supporters of Brian Hurley ("Hurley"), a Senior Vice President/Group Business Director at DDB Chicago to whom Wessman reported. The other "camp" consisted

of supporters of Diane Ruggie ("Ruggie"), Group Creative Director and the other senior DDB official in charge of the Safeway account.

Wessman took six vacation days during her time on the Safeway account. The parties dispute the significance of these; Wessman claims that she had informed DDB Chicago of the need for these days prior to her having accepted the assignment. On May 16, 2011, Wessman claims that she reported vulgar comments by Hurley about Laurie Kief ("Kief"), a past subordinate of Hurley's. Hurley denies these comments which, according to Wessman, consisted of Hurley's having told her that he had "always wanted to fuck" Kief. Wessman claims to have made this report to Natalie Sundquist ("Sundquist"), Vice President/Director of Recruiting & Career Development for DDB Chicago, as well as Don Hoffman ("Hoffman"), Executive Vice President/Global Business Director at DDB Worldwide. Wessman claims that Hoffman "burst out laughing" when he heard about Hurley's comment. Sundquist and Hoffman deny that Wessman reported this conduct to them.

Over the Memorial Day weekend, Elizabeth West ("West"), one of Wessman's subordinates, told Wessman about an e-mail that contained a picture of Kief playing pool with a subject line stating something like "would you like to fuck her". Wessman claims that she reported West's statement about the e-mail to Sundquist on June 2, 2011. Wessman also claims that she told Sundquist that she (Wessman) suspected Hurley of having sent the e-mail because of his prior comments about Kief, as well as his having the capability to send such an e-mail via his phone. Sundquist

admits that Wessman told her generally about the e-mail, which Sundquist had previously investigated without being able to determine the identity of the sender.

On May 18, 2011, Wessman had a meeting with members of the Safeway account team that did not include Hurley. What occurred in the meeting, however, is disputed. According to DDB Chicago, Wessman spoke disparagingly of Hurley, claiming that he did not support Ruggie and other team members. In other words, Wessman, DDB claims, was attempting to widen the gulf between Hurley and Ruggie. DDB Chicago also alleges that Wessman encouraged team members to communicate with Safeway representatives separate from Hurley and to "treat [Hurley] like a client" in that only positive comments about the team's performance should be made to him.

Wessman offers a different version of the meeting. According to her, she was trying to act as a peacemaker between the Hurley and Ruggie "camps." Rather than attempting to keep Hurley out of the loop, Wessman claims that her comment about treating him like a client was intended to eliminate the negative comments directed towards Hurley. In other words, just as a client should not be addressed negatively, neither should Hurley. Wessman denies that she claimed that Hurley did not support Ruggie or other team members.

On June 9, 2011, Wessman, Hurley, Hoffman, and Sundquist had what amounted to a "summit meeting" regarding the Safeway account stemming from friction between Wessman and Hurley. Hoffman offered to arrange the Safeway

account any way Wessman wanted so as to allow her to stay on it. Hoffman claims that he viewed the meeting as productive, and Wessman was "really super flattered" that Hoffman was willing to allow her to design her work on the Safeway account in whatever way worked for her. The other events at that meeting are disputed, however. Wessman claims that she expressed her desire not to continue working for Hurley due to how vulgar he was. Sundquist and Hoffman deny that this issue arose.

What is undisputed is that Wessman sent an e-mail to Hoffman, Hurley, and Sundquist resigning from the Safeway account later that evening. Wessman indicated that: (i) the position of Account Director for the Safeway account required long, grueling days and much travel; (ii) the level of engagement required was "impossible"; (iii) the time zone difference caused problems for Wessman; and (iv) she could not specify the hours during which she would be available to work. Wessman claims that Hurley's behavior was the main reason that she could not remain on the Safeway account.

According to Wessman, she was unsatisfied with DDB Chicago's response to her reports about Hurley's conduct, so she reported it to Linda Waste ("Waste"), Senior Vice President/Director of Talent for DDB Chicago. Wessman further alleges that she reported Hurley's conduct to Dick Rogers ("Rogers"), Chairman of DDB North America, who was dismissive, according to Wessman. DDB Chicago denies that Wessman made any of these reports.

Meanwhile, Wessman was searching for other accounts to join. On June 6, 2011, DDB Chicago announced that the Wrigley account would be expanding, and Wessman sought a position on it. After Wessman had resigned from the Safeway account, Sundquist sent an e-mail to Heather Malenshek ("Malenshek"), head of the Wrigley account on June 14 in which she requested that Malenshek "defer" Wessman to Sundquist should Wessman inquire of Malenshek about a position on that account.

On June 24, 2011, Waste e-mailed Wessman that Wessman would not be a good fit for the Wrigley account. Wessman declined Sunquist's request to submit a formal letter of resignation from DDB Chicago. On July 5, 2011, DDB Chicago terminated Wessman's employment.

II.    Procedural History

On September 26, 2011, Wessman filed a charge of retaliation with the Equal Employment Opportunity Commission ("EEOC"). She named DDB Worldwide as the employer responsible for the conduct and listed DDB Chicago's address. On May 23, 2012, the EEOC issued a Notice of Right to Sue letter to Wessman.

On October 11, 2012, Wessman filed a two-count first amended complaint alleging: retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* against DDB Chicago and DDB Worldwide (Count I); and a breach of contract claim under Illinois law against DDB Chicago, DDB Worldwide and Hurley (Count II). On December 13, 2012, this Court dismissed both counts against Hurley and DDB Worldwide but denied DDB Chicago's motion to

dismiss these counts. *See Wessman v. DDB Chi.*, No. 12 C 6712, 2012 U.S. Dist. LEXIS 176562 (N.D. Ill. Dec. 13, 2012). On July 11, 2013, DDB Chicago moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, discovery, disclosures, and affidavits establish that there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the non-moving party to show through specific evidence that a triable issue of fact remains on which the non-movant bears the burden of proof at trial. *Id.* at 325. The non-movant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; she must go beyond the pleadings and support her contentions with documentary evidence. *Id.* A genuine issue of material fact exists when, based on the evidence, a reasonable jury could find in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court construes all facts and draws all reasonable inferences in favor of the non-movant. *Smith v. Hope Schs.*, 560 F.3d 694, 699 (7th Cir. 2010).

DISCUSSION

I.     Title VII Retaliation Claim

DDB Chicago argues that summary judgment is proper because Wessman cannot show that her termination occurred in retaliation for her having reported Hurley's alleged misconduct. Title VII forbids employers from discriminating against an employee for opposing a practice prohibited by Title VII, or for participating in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a) (the "anti-retaliation statute"). The purpose of the anti-retaliation statute is to protect victims of discrimination who complain about illegal conduct to the EEOC, the courts, or the employer itself. *See generally Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2006).

A plaintiff may establish a claim for unlawful retaliation via either the direct or indirect method of proof. *Id.* at 786. To establish a prima facie case of retaliation under the direct method, a plaintiff must show that: (i) she engaged in protected expression; (ii) she suffered an adverse employment action; and (iii) a causal link existed between the two. *Kasten v. Saint-Gobain Perform. Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2013). A plaintiff may prove retaliation by either direct or circumstantial evidence. *Id.* at 972.

Direct evidence is that which, if believed by a jury, will prove the particular fact in dispute "without reliance upon inference or presumption." *Id.* at 973 (citation omitted). Circumstantial evidence "allows a jury to infer retaliation[.]" *Id.* A

plaintiff may prove retaliation through circumstantial evidence by showing: (i) suspicious timing, ambiguous statements or behaviors; (ii) evidence that similarly situated employees who did not lodge complaints were treated differently than the plaintiff; or (iii) "a pretextual reason for an adverse employment action." *Id.* (citation omitted). In other words, causation can be demonstrated "by presenting a convincing mosaic of circumstantial evidence that would support the inference that a retaliatory animus was at work." *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1180 (7th Cir. 2013) (citation and internal quotation marks omitted). "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Southwestern Med. Ctr. v. Nassir*, 133 S. Ct. 2517, 2528 (2013). After *Nassir*, the Seventh Circuit has expressly endorsed the "convincing mosaic" approach to proving causation under the direct method. *See Hobgood v. Ill. Gaming Bd.*, 722 F.3d 1030, 1032 (7th Cir. 2013) ("This case presents a good example of a plaintiff's use of the 'convincing mosaic' approach to showing that an employer acted for unlawful reasons.").

The indirect method calls for the plaintiff to establish the first two prongs of the direct method, plus a showing that she performed her job satisfactorily but was treated less favorably than similarly situated employees who did not complain of discrimination. *Stephens*, 569 F.3d at 786-87. If the plaintiff satisfies her initial burden under the indirect method, the defendant must articulate a legitimate, non-discriminatory reason for its actions. *Id.* at 787. If the defendant does so, the burden

shifts back to the plaintiff, who must show that the defendant's stated reason is a pretext to a discriminatory motive. *Id.*

Wessman argues that DDB Chicago's reasons for having terminated her: (i) are pretextual; and (ii) have shifted over time. "Pretext is a lie, specifically a phony reason for some action." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008). The Court will catalogue some of the reasons for Wessman's termination that, when drawing reasonable inferences in her favor, constitute pretext.

DDB Chicago argues that it terminated Wessman because she resigned from the Safeway account and that her performance on that account contributed to divisiveness, thus rendering her unworthy of reassignment to other accounts. Yet, Wessman was told when she sought reassignment that no openings on other accounts were available. Hoffman made similar assertions in his deposition; however, Christiansen was hired on June 27 as Account Director for the Wrigley account—over a week prior to Wessman's termination. The Court draws the reasonable inference in Wessman's favor that the Wrigley account (setting aside other accounts) did have an opening for which DDB Chicago was seeking candidates during the relevant time period. If Wessman's divisiveness had been the principal cause for concern, the Court fails to see why Wessman would have been given the explanation regarding a dearth of open positions.

DDB Chicago also cites Wessman's request for more compensation as a justification for her termination. Christiansen, however, received a $165,000 salary

for her position on the Wrigley account.  Christiansen was hired prior to Wessman's termination for a position about which Wessman had been told that no openings existed.  Additionally, it is a reasonable inference that Wessman sought more compensation due to her increased work load beyond what she had contractually agreed to perform.  (The Court shall elaborate upon Wessman's breach of contract claim in Part II, *infra*.)

DDB Chicago has offered another reason for Wessman's not having been assigned to the Wrigley account: Malenshek's dissatisfaction with Wessman's performance on it earlier in 2011.  Yet, Hoffman and Sundquist testified that Wessman's having been given the Account Director position on the Safeway account had been influenced by the positive feedback they had received regarding her performance on the Wrigley account under Malenshek.  Wessman also testified that she received praise from Malenshek during her time on the Wrigley account.  The issue of Malenshek's view of Wessman's performance, therefore, is one of fact for a jury to determine.

DDB Chicago principally argues that Wessman was terminated because she resigned from the Safeway account on June 9 after Hoffman had offered to arrange Wessman's working conditions any way she wanted.  Wessman disputes this contention, claiming that the main issue for her on the Safeway account involved Hurley's vulgarity.  Wessman continued to report Hurley after she had resigned from the Safeway account, and neither Hoffman nor Sundquist told Wessman that she

would not be assigned to other accounts due to her resignation from the Safeway account. Instead, Wessman was told that there were no openings on other accounts after she had indicated a willingness to work on other accounts. It is reasonable to infer, therefore, that Wessman's resignation from the Safeway account was not the main reason for her termination.

A final issue that perplexes the Court involves expense accounts. DDB Chicago indicated in its response to Wessman's EEOC charge that Wessman had displayed unprofessional judgment with respect to these accounts; however, Hoffman testified later that the issue had not played a role in Wessman's termination. This example highlights the potentially shifting reasons for Wessman's termination, which may constitute evidence of pretext. *See Kasten*, 703 F.3d at 974.

The timing of Wessman's termination is also suspicious when viewing the facts in the light most favorable to her. Wessman claims that she reported Hurley multiple times—first on May 16 followed by reports on June 2 and June 14. She claims that she resigned from the Safeway account because of Hurley's vulgar behavior. Hurley denies this behavior, and Hoffman, Sundquist and Waste deny that Wessman made most of these reports. DDB Chicago concedes that Wessman referenced West's comments about an e-mail on June 2, though DDB Chicago denies that Hurley's name arose. Wessman was terminated on July 5—approximately three weeks after her last report to Waste. Wessman also claims that she reported Hurley to Rogers on June 20—fifteen days before her termination.

With respect to the comparison between Wessman and other employees of DDB Chicago, the parties dispute in detail which other employees were similarly situated to Wessman and how those employees were treated. The Court need not delve into this issue, however. When drawing all facts and reasonable inferences in Wessman's favor, a reasonable jury could find that DDB Chicago's reasons for having terminated Wessman are pretextual and that the reasons have shifted over time. A reasonable jury also could find, if it believes Wessman's account, that the timing of her termination was suspicious. Thus, a reasonable jury could find, under the "convincing mosaic" approach, that Wessman's reports about Hurley caused her termination in violation of Title VII. As such, DDB Chicago's motion for summary judgment with respect to Wessman's Title VII claim is denied.

II.    Breach of Contract Claim

DDB Chicago avers that summary judgment is proper with respect to this claim because Wessman's alleged damages are too speculative. According to DDB Chicago, since Wessman's new salary with AETNA pays her $100,000 annually—the same salary that she was earning in her role on the Safeway account at DDB Chicago—she has been made whole after her termination. Any additional damages, DDB Chicago contends, would be speculative because it is unclear what Wessman should have been paid aside from her $100,000 salary. Finally, DDB Chicago posits that the integration clause of the contract bars extrinsic evidence propounded by Wessman regarding the eighty percent work load and the scheduling flexibility issue.

The Court is unpersuaded by DDB Chicago's arguments. First, there exists a material dispute of fact as to what Wessman had agreed to in terms of scheduling flexibility and the amount of work that she would perform for DDB Chicago. Wessman avers that she agreed to a work load of eighty percent in exchange for her acceptance of a below-market salary of $100,000. Instead, Wessman alleges, she was forced to endure a full work load, and this burden interfered with her child care needs. Wessman, therefore, is asserting that she was underpaid for the work that she performed for DDB Chicago, and her $100,000 salary with AETNA does not cure this alleged loss of the benefit of Wessman's bargain. Wessman, in effect, argues that she was paid based upon an eighty percent work load when she was in fact performing a full work load.

With respect to DDB Chicago's suggestion that any other damages are speculative because conflicting evidence exists as to how similar account directors were compensated, the Court is equally unpersuaded. The record indicates that, for instance, Christiansen received a salary of $165,000 for her work on the Wrigley account. Wrigley is, of course, different from Safeway, and no two accounts are identical. This argument, however, is properly reserved for a jury. The parties have submitted differing figures as to what account directors were paid in 2011, but a dispute over the amount of damages—a common occurrence—does not per se justify the granting of summary judgment with respect to this issue. A jury can sift through

the conflicting evidence regarding the proper amount of pay for a full-time account director and determine what (if any) damages are proper.

The Court addressed DDB Chicago's argument with respect to the integration clause of the contract when it denied DDB Chicago's motion to dismiss Wessman's complaint. *See Wessman*, 2012 U.S. Dist. LEXIS 176562, at *12-14. The contract is silent with respect to the number of hours required to be worked. Nothing in the record since the Court's ruling has altered the Court's reading of the contract as a partially integrated one due to this omission. The question of the eighty percent schedule is one of fact that will be decided by a jury and not this Court. As DDB Chicago has failed to illustrate the lack of a material dispute of fact regarding Wessman's breach of contract claim, the motion for summary judgment with respect to this count is denied.

III.    Wessman's Request for Sanctions

In her response memorandum, Wessman complains that DDB Chicago's motion for summary judgment is "frivolous" and that it comes "perilously close" to violating Federal Rule of Civil Procedure 11. Wessman appears to request not only costs but attorneys' fees incurred in responding to the instant motion. While Wessman carries the motion as "frivolous[,]" she does not explicitly allege that DDB Chicago violated Rule 11, instead using the "perilously close" language. While the Court agrees that summary judgment is inappropriate with respect to both counts, the Court declines to characterize DDB Chicago's motion as having been brought in bad

faith or in any other way unethical. As such, Wessman's request for costs and attorneys' fees with respect to the response to the instant motion is denied.

CONCLUSION

The instant case is rife with disputes of material fact, including: (i) what Wessman reported; (ii) to whom she reported it; (iii) why she was terminated; (iv) why she resigned from the Safeway account; (v) whether she agreed to a $100,000 salary in exchange for an eighty percent work load and scheduling flexibility due to the needs of her children; and (vi) what (if any) damages are required to make her whole. Given the vast array of disputes, a jury is the proper arbiter to resolve the conflicts, and DDB Chicago's motion for summary judgment is denied in its entirety. Wessman's request for costs and attorneys' fees incurred in responding to the instant motion is also denied.

_Charles P. Kocoras_

_____
Charles P. Kocoras
United States District Judge

Dated:  October 29, 2013